In re Thomas B. SPARKS and Dorothy E. Sparks, Debtors.

No. 05–24832.

United States Bankruptcy Court, S.D. Ohio, Western Division.

July 26, 2006.

David A. Kruer, Esq., Dearfield, Kruer & Company LLC, Portsmouth, OH, for Debtors.

Waymon B. McLeskey II, Esq., Columbus, OH, for HSBC Auto Finance.

John A. Schuh, Esq., Cincinnati, OH, for Ford Credit.

Margaret A. Burks, Cincinnati, OH, Chapter 13 Trustee.

### ORDER REGARDING OBJECTION TO CONFIRMATION

J. VINCENT AUG, JR., Bankruptcy Judge.

This matter is before the Court on the objection to confirmation of the plan (Doc. 25) filed by Creditor HSBC Auto Finance aka Household Automotive Finance ("HSBC"), the amended objection (Doc. 35), and on the Debtors' response and memorandum in support of confirmation (Doc. 36). In addition, Ford Motor Credit Company was permitted to file an amicus curiae brief (Doc. 38) and HSBC filed a hearing brief (Doc. 39). A hearing was held on June 14, 2006, after which this Court considered the matter to be submitted on the briefs and arguments of counsel and took the matter under advisement.

This Court has jurisdiction over this matter under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L). The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

The facts in this matter are not disputed. On October 29, 2003, the Debtors purchased a 2004 Jeep Grand Cherokee. On November 17, 2005, Debtors filed a chapter 13 petition. Since Debtors filed their petition after October 17, 2005, they are subject to the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

In their second amended plan (Doc. 32), the Debtors propose to cram down HSBC's debt to $18,237.50 with interest at the rate of 6.5%. In the event we find that the Debtor cannot cram down HSBC's

loan, the Debtors provide two alternatives for dealing with HSBC's collateral in their plan. First, the Debtors propose that they be given time to pursue a sale of the Jeep pursuant to the terms of § 363(f). Second, Debtors propose to surrender the Jeep to HSBC in full satisfaction of the debt owed to HSBC.

HSBC's objections and hearing brief raise several[1] issues that HSBC asserts prevent the plan from being confirmable under any of the above scenarios:

1. Pursuant to the hanging paragraph in § 1325(a), the Debtors cannot cram down HSBC's claim.

2. Pursuant to the Supreme Court's decision in *Till v. SCS Credit Corp. (In re Till)*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004), the Debtors have failed to provide for the proper amount of interest on HSBC's claim.

3. Section 363(f) does not permit the Debtors to sell the Jeep free and clear of all liens.

4. If Debtors surrender the Jeep to HSBC, the plan must provide for payment of any deficiency balance as an unsecured claim.

In their memorandum in support of confirmation, the Debtors state that they are prepared to stipulate for purposes of the hearing that

(1) the motor vehicle in question [the 2004 Jeep Grand Cherokee] is subject to a duly perfected, purchase money security interest in favor of and secures a consumer debt owed to the Creditor, HSBC Auto Finance, ... (2) such debt was incurred seven hundred fifty days prior to the Debtors' date of filing the instant chapter 13 bankruptcy; (3) the claim of [HSBC] falls within the scope of the claims described within the hanging paragraph following [11 U.S.C.] § 1325(a)(9); (4) the contract balance owed [HSBC] is $26,189.26; and (5) the fair value of such vehicle ( [HSBC's] allowed secured claim for purposes other than § 1325(a)(5)) is $18,237.50, if determined using a replacement standard as contemplated by *Associates v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997).

## A. *Cram down of 910 vehicle.*

Relevant provisions of § 1325(a) of BAPCPA provide:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

. . .

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B) . . .

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim . . . ; or

(C) the debtor surrenders the property securing such claim to such holder.

11 U.S.C. § 1325(a)(5)(B)(ii). Also relevant to this decision is a paragraph following § 1325(a)(9) that has become known as the "hanging paragraph" of § 1325(a). This hanging paragraph provides:

For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the

---

**1.** HSBC also asserts that the plan cannot be confirmed because to the best of HSBC's knowledge, the Debtors have failed to maintain insurance on the vehicle as required by L.B.R. 3015–3. This issue was not argued at the hearing on June 14, 2006.

910–day [period] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if the collateral for the debt consists of any other thing of value, if the debt was incurred during the 1–year period preceding that filing.

Section 506(a) provides:

(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of such value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest is ... less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

Section 1322(b)(2) provides that a plan may:

(1) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

■ Debtors argue that regardless of the provisions of the hanging paragraph, they may still cram down HSBC's secured claim to the value of the Jeep. The Debtors' argument rests on the proposition that the provisions of § 1325(a) are discretionary, not mandatory. As support for this suggestion, Debtors cite *In re Szostek*, 886 F.2d 1405 (3d Cir.1989) (compliance with the provisions of § 1325(a)(5)(B)(ii) is not mandatory). *Contra Barnes v. Barnes (In re Barnes)*, 32 F.3d 405 (9th Cir.1994)

(compliance with the provisions of § 1325(a)(5)(B)(ii) is mandatory). The Supreme Court has also stated pre-BAPCPA that "[t]o qualify for confirmation under Chapter 13, the [debtors'] plan had to satisfy the requirements set forth in § 1325(a) of the Code." *Assoc. Commercial Corp. v. Rash*, 520 U.S. 953, 956, 117 S.Ct. 1879, 1882, 138 L.Ed.2d 148 (1997). *See also Till v. SCS Credit Corp.*, 541 U.S. 465, 468, 124 S.Ct. 1951, 1955, 158 L.Ed.2d 787 (2004) (to qualify for approval, a chapter 13 plan *must* accommodate each allowed, secured creditor in one of the three ways set forth in § 1325(a)(5) (emphasis added)).

Debtors state that the plain language of § 1325(a) provides that the "court shall confirm" a plan that meets the provisions of § 1325(a). However, they then take this "plain language" and turn it on its head stating that it does not mean that the court cannot confirm a plan that does not meet all of the provisions of § 1325(a) but only prescribes the circumstances under which the court must confirm the plan. As support for this proposition, the Debtors refer us to the language of § 1322(a) that contains the provisions of what the plan shall contain.

Even though the Debtors argue that the language of the statute is plain, they then go on to read much into the nearly nonexistent legislative history and suggest that such history reflects that Congress is aware of the discretionary nature of § 1325(a). However, the Debtors cite to no language in the history that indicates Congress gave any thought whatsoever to whether § 1325(a) is discretionary. Debtors concede that the legislative history does show an intent by Congress to address a perceived abuse of debtors purchasing a vehicle shortly before filing bankruptcy and then cramming down the amount owed to the creditors. Debtors argue however that "it would be an absurd

result ... to conclude Congress intended to absolutely eliminate cram down and afford windfall profits to the car lending industry." It is not clear, however, why limiting (not eliminating) cram downs by debtors would be an absurd result where it directly addresses the perceived abuse in a proposed amendment captioned "GIVING SECURED CREDITORS FAIR TREATMENT IN CHAPTER 13 ... (b) RESTORING THE FOUNDATION FOR SECURED CREDIT." Contrary to Debtors conclusion, the amendment does not absolutely eliminate cram down but eliminates it for a limited time period of 910 days which is consistent with preventing debtors from cramming down a vehicle shortly after filing a chapter 13 petition.

■ Debtors have stipulated that "the claim of [HSBC] falls within the scope of the claims described within the hanging paragraph following [11 U.S.C.] § 1325(a)(9) and ... the contract balance owed [HSBC] is $26,189.26." Consistent with the majority of the case law, we find that the provisions of § 1325(a) are mandatory and where the debt meets the parameters of the hanging paragraph, the Debtors are prevented from cramming down the secured debt of HSBC. *See In re Brown,* 339 B.R. 818 (Bankr.S.D.Ga.2006); *In re Horn,* 338 B.R. 110 (Bankr.M.D.Ala. 2006); *In re Robinson,* 338 B.R. 70 (Bankr.W.D.Mo.2006); *In re Johnson,* 337 B.R. 269 (Bankr.M.D.N.C.2006); *In re Montoya,* 341 B.R. 41 (Bankr.D.Utah 2006). *Contra In re Carver,* 338 B.R. 521 (Bankr.S.D.Ga.2006) (§ 1325(a)(5) applies to secured claims; the status of claims as secured or unsecured is made pursuant to § 506(a); the hanging paragraph makes § 506 inapplicable to a 910 claim, therefore, § 1325(a)(5) does not apply to a creditor's 910 claim). We respectfully disagree with the analysis set forth in *In re Carver.*

## B. *Interest Under Till.*

■ Both parties agree that interest on the debt is to be calculated pursuant to the Supreme Court's decision *Till v. SCS Credit Corp.,* 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004).

> [N]o provision of BAPCPA prohibits the modification of secured creditors' rights under § 1322(b)(2). Consequently, while the 910 Creditors are entitled to fully secured claims, the applicable interest rate necessary to meet the present value requirement of § 1325(a)(5)(B)(ii) is governed by *Till v. SCS Credit Corp.,* 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004).

*In re Brown,* 339 B.R. at 822.

> A debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment. The challenge for bankruptcy courts reviewing such repayment schemes, therefore, is to choose an interest rate sufficient to compensate the creditor for these concerns.

*Till,* 541 U.S. at 474, 124 S.Ct. at 1958. The rate to be applied is the "prime-plus" formula discussed in *Till. In re Robinson,* 338 B.R. at 75.

> Taking its cue from ordinary lending practices, the [formula] approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the ap-

proach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan.

*Till,* 541 U.S. at 478–79, 124 S.Ct. at 1961.

Debtors propose to pay interest on HSBC's debt at the rate of 6.5% based on "prime" being either the "Federal Funds Rate (the rate at which commercial banks loan money to each other) or the Federal Reserve Bank Discount Rate (the rate at which banks borrow money from the Federal Reserve)."

HSBC objects, arguing that it is entitled to interest using the "national prime rate" according to the *Wall Street Journal* as a starting point and then applying the plus one to three percent suggested in *Till* as a risk factor generally used by the bankruptcy courts. *Till,* 541 U.S. at 480, 124 S.Ct. at 1962.

As noted above, the Supreme Court held that the rate of interest should be "the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower." *Id.* at 478, 124 S.Ct. at 1961. We believe that neither of the Debtors' proposed sources reflect this rate of interest. One is the rate charged between banks and the other is the rate at which banks can borrow from the Federal Reserve. Both of which must be less than a bank would then charge a "creditworthy commercial borrower."

We agree with HSBC that the rate published daily in the WSJ satisfies the source contemplated by the Supreme Court. The WSJ prime rate reflects the "base rate posted by 75% of the nation's largest banks." In addition, the rate published by the Federal Reserve as the "bank prime loan rate" is also a satisfactory source for the "national prime rate." That rate reflects the "rate posted by a majority of top 25 (by assets in domestic offices) insured U.S.-chartered commercial banks. Prime is one of several base rates used by banks to price short-term business loans." Our research reflects that these rates are substantially similar. Accordingly, we find that the prime rate published daily in the *Wall Street Journal* or the bank prime loan rate published daily by the Federal Reserve at www.federalreserve.gov/releases/H15 meet the requirements of the Supreme Court to start with the "national prime rate" in calculating the rate of interest due to creditors under § 1325(a)(5).

Both Debtors and HSBC added a risk factor of 1.5% to their suggested national prime rate. Therefore, since they are apparently in agreement, we need not determine the specific risk factor in this case.

## C. *Applicability of § 363(f) to Chapter 13.*

▮ In the event Debtors are unsuccessful in their attempt to cram down HSBC's debt, Debtors ask this Court to delay entry of an order on confirmation so that they have time to file a motion under §§ 363(f) and 506 to sell the property of the estate free and clear of HSBC's lien as a "redemption." To do this, the Debtors propose to sell the Jeep to themselves for the trade-in value of the Jeep which they claim is $16,837.50. Nowhere do Debtors provide support for this presumptuous tactic.

Section 363(f) permits the Debtors to sell property free and clear of liens, only if

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

First, redemption is available to chapter 7 debtors under 11 U.S.C. § 722. There is no comparable "redemption" procedure available in chapter 13.

Further, Debtors cannot show that they meet any of the above five situations that would permit them to sell the Jeep to themselves free and clear of HSBC's liens. Nonbankruptcy law does not permit the sale of the Jeep free and clear of the liens (to anyone, let alone the Debtors); obviously HSBC does not consent to the sale nor could it be compelled to accept a money satisfaction less than the amount owed on the debt. Debtors have stipulated that they owe the debt to HSBC so there can be no bona fide dispute regarding the debt.

Finally, we have already determined that the value of the property securing the lien cannot be separated into secured and unsecured parts. The value of the lien is $26,189.26 and pursuant to § 363(f)(3) the price at which the Jeep is sold must be greater than the value of the liens on the Jeep. Therefore, $26,189.26 is the amount that Debtors must pay if they wish to sell the Jeep to themselves pursuant to § 363(f).

D.  *Surrender of Vehicle in Full Satisfaction of Debt.*

In the event all else fails, the Debtors propose to surrender the Jeep to HSBC in full satisfaction of their debt. HSBC argues that historically a creditor has been allowed to file a claim for the unsecured balance remaining due to the creditor after a proper sale of the vehicle.

In this district, Judge Preston recently addresses this very issue in the well-reasoned opinion *In re Payne*, 347 B.R. 278, 2006 WL 2289371 (Bankr.S.D.Ohio2006). Similar to HSBC, the creditor in *In re Payne* argued that through BAPCPA, Congress was attempting to remedy a perceived abuse by debtors who purchase vehicles on credit on the eve of filing bankruptcy and then use § 1325 to pay the creditor less than the full amount of the debt. HSBC argues that under BAPCPA Congress intended to provide more protection to creditors and that Congress could not have meant to expand the rights of Debtors in the area of surrender.

However, as stated by Judge Preston,

This Court having studied the "hanging paragraph" of § 1325(a) finds the language unambiguous and clear. The "hanging paragraph" of § 1325(a) does not limit its application to claims treated under § 1325(a)(5)(B). It states quite simply, that "[f]or purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph...." Thus, it must apply to claims described in § 1325(a)(5)(C) as well. The plain meaning of this statute cannot be overcome by silence in the legislative history.

* * *

From a practical standpoint, this application of § 1325(a)(5) requires the creditor to forego the opportunity to take advantage of the provisions of § 506 should it liquidate the collateral for less than the amount it is due, just as it requires the debtor to do so should the debtor decide to retain the vehicle. While this may appear to be inconsistent with the overall goals of BAPCPA to provide greater protections to creditors,

the Court is not prepared to say that this is an absurd result in light of the sparse guidance from Congress.

*In re Payne,* 347 B.R. at 282, 283, 2006 WL 2289371. *See also, In re Ezell,* 338 B.R. 330, 342 (Bankr.E.D.Tenn.2006) (the hanging paragraph applies equally to revised § 1325(a)(5)(B) and revised § 1325(a)(5)(C); surrender of the collateral subject to the hanging paragraph satisfies the allowed secured claim in full).

As stated, we find the decision in *In re Payne* to be very well-reasoned and adopt Judge Preston's analysis. We find that the Debtors' plan may provide for the surrender of the Jeep in full satisfaction of the secured debt owed to HSBC.

Based on the foregoing, the Debtors shall, within fourteen (14) days of entry of this Order, file a Third Amended Plan consistent with the findings herein.

IT IS SO ORDERED.